of the ordinance at issue limits the placement of donation boxes to specified zoning use districts in the City of Arlington. The number of zones in which donation boxes are permitted, relied on heavily by the Appley Charities, is an artificial metric. Zones are not homogenous units comprised of equal landmass. They vary widely in size, use, and other characteristics. What the record shows in this case is that the zones in which donation boxes are permitted encompass over 62% of all non-residentially zoned land in the city, some 7,100 acres. And further, the evidence shows that contrary to what the Appley Charities contend, which is that these zones are relegated to the outskirts of the city, they in fact line arterial roadways and are dispersed equally with the permitted zones, often located directly across the street. And the record at 13-18 reflects a map that juxtaposes the non-residential permitted zones and non-residential non-permitted zones and shows very clearly that these zones are located throughout the city. That is also the map that's on the last page of the exhibits we submitted today. In its summary judgment ruling, the trial court correctly found that the ordinance was content-neutral, but it erred in applying intermediate scrutiny to the zoning provision and finding it unconstitutional, and it erred in a number of ways. First, running afoul and making the same mistakes that the Second Circuit made in Ward v. Rock Against Racism, the court improperly substituted its judgment for that of the City Council in finding that space-based restrictions, as opposed to zoning-based restrictions, would be just as effective at curbing the ills the city sought to address. Similarly, just as in Ward, the court erred by holding the zoning provision cannot stand absent evidence that the ordinance's other regulations or less restrictive zoning limitations proved ineffective to control the substantial government interest at issue. Compounding these errors, the court further erred by focusing solely on geographic area in which donation boxes were allowed, instead of whether the ordinance targeted speech beyond the ills that were sought to address by the city, that the city sought to address. And lastly, the court did not consider all of the alternative channels of communication through which appellees may, and in fact do, solicit charitable donations. They do that through door-to-door, they do that through flyers, billboards, telephone calls, they even have brick-and-mortar donation drop-off locations in the city. If allowed to stand, the trial court's holding will require the city and potentially other inch-by-inch until one day, perhaps after years of documented failed efforts, and maybe litigation, they finally achieve the desired result. That is not only untenable, it's not the law. A regulation will not be held invalid simply because a court concludes the government's explicit interest could be served some other way. In describing this in the Ward case, the Supreme Court said, the Court of Appeals erred in sifting through all the available or imagined alternative means of regulating sound volume. This related to the bandshell in Central Park. In order to determine whether the city's solution was the least restrictive means of hold, the time, place, and manner regulations are not invalid simply because there are some imaginative alternatives. The trial court made these same mistakes here in concluding that the space-based restrictions would be just as effective as zoning-based. In fact, the United States Supreme Court has upheld time, place, and manner regulations based on spacing and based on zoning. And those were the Renton and the American mini-theater cases. Arlington's reasoned decision to utilize zoning instead of space-based restriction was appropriate, reasoned, evidence-backed, and should have been deferred to by the trial court. The court likewise erred by requiring the city to prove with evidence that less restrictive alternatives were insufficient before upholding this provision. It is firmly established that content-neutral time, place, and manner regulations need not be, they need not be the least restrictive means, provided that they do not burden substantially more speech than necessary. Now, to be clear, a government may not regulate in a manner that burdens substantial speech beyond that which it seeks to address. And that happened in the Redondo Beach case where the city passed a citywide non-solicitation ordinance based on traffic problems that occurred at just two intersections and was the result of day workers seeking work in those locations. Nevertheless, the city passed a sweeping anti-solicitation measure that arguably precluded lemonade stands and the sale of Girl Scout cookies, and clearly that was not targeted and not narrowly tailored to the problem that was experienced. The ordinance here suffers from no such flaws. It was passed to address operator accountability, illegal dumping and cleanliness, traffic and visual blight, and very importantly, to aid in the enforcement of donation boxes because Arlington Code compliance does not have near the number of officers as the police department, for example. And so it is much easier for the city to patrol and enforce donation boxes if they are in defined areas. The ordinance in this case has held that that is a . . . that administrative convenience and ease is a valid government interest, and that was in the International Society of Krishna v. Eve's case, 601 F. 2nd 809, and the pinpoint site is . . . I want to be sure I'm understanding. What are you claiming is your valid government interest in this case? What was the zoning provision designed to address? Yes, Your Honor. So there were . . . the ordinance as a whole was to address what is reflected in the record as a years-long problem with unattended donation boxes. They had proliferated throughout the city. They were unkempt. They caused . . . they invited illegal dumping. They were unsightly. I mean, they were unsightly, and enforcement was very difficult because it was unclear who was responsible for them in many cases. And what the city's studies show, and this is in the record, is that the biggest problem with donation boxes was located in the city center. Those areas, by definition under the Unified Development Code, consists of shopping centers and malls and offices where there are multiple tenants per property, and these tenants would each authorize the placement of donation boxes, and it would result in multiple donation boxes, a lack of clarity as to which property owners were responsible for those, and other issues. In addition, these are gateway intersections in the city. These are intersections that are, in essence, if you're familiar with Arlington, Texas, are in the region of the Cowboy Stadium and the Texas Rangers baseball stadium. They are flagship areas. They are not the most high traffic. Appellees argue that, well, these are the highest traffic we should be able to solicit there. There's no evidence in the record of that. But what these intersections are, are Arlington's first opportunity to make an impression on And they, therefore, have a substantial interest in restricting the placement of donation boxes in those areas. Those are factors that played into the passage of this ordinance, and I want to be very clear that unlike many of the cases that the parties cite, the record here as to Arlington's considerations in passing this is robust. They studied donation boxes for five months. They sought and received input from all donation box stakeholders, including Ms. Donnelly and her charity clients in this case. They submitted questionnaires and actually had passed a previous version of the ordinance, then amended it before it went effective in an effort to strike a balance as to what worked for the city and what doesn't. And again, referring back to the map I provided and that's in the record, these areas are dispersed throughout the city. There are over 7,000 acres in which donation boxes can be placed. So far from the total ban in Planet Aid, which was passed to target two specific charitable donation boxes incidentally. This ordinance allows ample opportunity to not only place boxes, but it leaves open all of the other channels of communication, and it is decidedly content neutral. Now, I'd like to briefly address . . . It seems to me that if the plaintiffs are correct, that there is a dramatic barrier almost to the visibility of these bins because of the limitations of where they can be placed. Very much affecting the kinds of visual contact with citizens that would cause them to become victims of personal property. That's a factual question, it seems to me, just how widespread availability there are, how limited that is. You say Arlington reasonably wants visitors not to see trash lying around next to these bins and whatever, but how does that fit under intermediate scrutiny? If factually we accept that this record does not support widespread, meaningful availability of locations, if they're industrial locations and others, how should that weigh on us under intermediate scrutiny that they, in fact, cannot get their message out? If that were the case, Your Honor, that would be a challenge for the city. I would point . . . One thing that's a feature of that, there's some discussion about churches and whether churches in residential areas can have these bins. Include that in your answer because I think it affects this overall question. I will, Your Honor. If that were the case, that setback requirement, which is 40 feet, it's about the length of this courtroom, prevented visibility of these donation boxes in most locations in the city, that would be problematic. That is not the case. The evidence in the record is as follows, and the court properly struck some of it, but I will address briefly what was testified to. One representative of the National Federation for Blind said 40 feet is too much. You can't see it. We asked, well, what's the basis of that? Well, just reading of the ordinance, there's no evidence of any specific property. Same question was posed to Arms of Hope, and they said it's too far, the closer the better. It was literally the testimony. We'd prefer it to be as close as we can. Not competent summary judgment evidence, the court properly disregarded it. The competent summary judgment evidence was provided by National Federation for the Blind for-profit box operator. This is the person that goes out and puts these boxes in Arlington and elsewhere. He testified that there was no visibility problem at 40 feet, and completely acknowledged that these boxes are six feet by five feet by four feet deep. And what they are contending is that a requirement that that box be placed the equivalent of two pickup trucks renders it not visible. It's just not the case, and there's no evidence of it. As mentioned, there is an expansive acreage where these are allowed. It would be remarkable for there not to be visibility at a considerable, if not complete, portion of that acreage. There are two other features of this, and I know you're going to get to the Church, but also it's not just the setback, it's the locations, that they're in less desirable locations of the city. So the evidence on that, it seems to me, is to me the bigger fat question, not the setback so much. Thank you, Your Honor, and I will address the Church question, too. That's just simply not the case. The United Development Code, Unified Development Code, describes the zones and says exactly where they are, and with respect to general commercial, that zone, it's the biggest zone in the permitted areas. It states that this zone flanks arterial streets throughout the city. Let me ask, would the ordinance allow general commercial, grocery stores, strip malls, strip shopping centers, whatever else, throughout the city for these bins to be there? No, the ordinance restricts the placement of bins to certain zones. So there's a huge part of the city where they're not allowed? They're allowed. You're right. I'm just asking factually. Yeah, factually, Your Honor, that would depend whether you include residential. Residential is not seriously in dispute. They say, well, we'd like to place them in churches and residential. Well, churches are also placed in non-residential, and they haven't filed applications and placed any there. But if you set aside residential where they do not contend they should be able to widely place boxes, then boxes are allowed in the majority of the city, in 62% of the non-residentially zoned areas of the city. It's a considerable area. With respect to where these areas are located and whether they are on the periphery or on the outskirts or somewhere where people can't see them, I would again refer the Court to our map, the last page of our exhibits today, which shows often these areas, the permitted areas are right across the street from the non-permitted areas. And they flank the same roads, and they are dispersed throughout the city. And on that map, the green shaded area is the permitted area, and the red is the non-permitted area, non-residential. And it clearly reflects, and there is no evidence to the contrary, that these areas are widespread throughout the city on major roads. All right, Counsel. Thank you very much. Thank you, Your Honor. Good morning, Your Honors, and may it please the Court. My name is Karen Donnelly, and I represent Appalese Cross Appellants, National Federation of the Blind of Texas, and Arms of Hope. Your Honors, this is not a regulation of signs or billboards. As Arlington concedes in its brief, this is the licensing and regulation of charitable solicitation. As reflected in the First Purpose Clause of the Donation Box Law passed in 2016, in the city's 2016 meeting minutes, the city admits it was targeting charitable solicitation when it passed its Donation Box Law. Do you, and I don't recall, do you see a distinction between charitable solicitations and solicitation? Yes, Your Honor, I do. I think the distinction is charitable solicitation is targeting a certain kind of solicitation, like religious solicitation or political solicitation, and any time a government targets a specific kind of solicitation, that is content-based regulation. Well, what is the underlying legal basis for that, that charitable gets a break, so to speak? That's a Supreme Court's trilogy in Riley, Schomburg, and Munson. All of those cases looked at state charitable solicitation statutes, and the Supreme Court applied three times there and affirmed in Madigan several years later that this is a categorically protected area of speech entitled to full First Amendment protection just as political speech. That's something we addressed before this Court in 2011 during the Abbott case, and I think the Abbott case followed that trilogy, and correctly so, as did Planet Aid following Abbott and the trilogy in the Sixth Circuit. So I think it's, and I would also point you to a more recent case out of the District of Connecticut, Kissel v. Siegel, looking at the Connecticut charitable solicitation law finding. Again, charitable solicitation is a protected category of speech under the First Amendment entitled to this special rule. What about panhandling? Can I repeat your question? I'm sorry. What about panhandling? People that stand out on the corner, you know, holding up a sign, help me, I'm hungry. I think General Larros is a case we cited that considers panhandling, and in General Larros the Court noted when solicitations for certain kinds of donations or things, so again, limiting the kinds of solicitation to specific categories or things, that is content-based regulation. And I think the Supreme Court in Reagan touched on that as well at page 1473, when the Supreme Court looked to Cantwell v. Connecticut and said, if a statute or law were to restrict based on a certain kind of solicitation, like religious solicitation or charitable solicitation, it would be content-based. But a content-neutral law, perhaps restricting, you know, the time of all solicitations in the city, regardless of manner or message, would be content-neutral. So I think the Supreme Court has drawn a guiding line there, and it follows all the prior precedent. So I'd also like to note that in the legislative history, the city concedes it knew that most donation boxes are placed on behalf of charitable organizations in Arlington, and that First Amendment protection is guaranteed if solicited charitably. But the city banned them anyway because it doesn't like them. It finds them unsightly, even when well-maintained, and that's the declaration of its code enforcement official. But the proof is that many of them were not well-maintained, correct? People would dump mattresses by them, and some would just see it as a place to dump personal property, regardless of whether it was going to be used for charity. Isn't there proof of that? There is evidence that there were 13 maintenance incidents over the five-month study conducted by Arlington in 2018. And the charities don't dispute that, I mean, any public receptacle, I think it's a reality, any public receptacle carries the risk of perhaps some debris around it, but that's the importance of the maintenance restrictions in this law. The charities aren't opposed to maintenance restrictions at all, and I think that those are just the way they are. I mean, I think it's just a matter of the city's ability to adequately address the city's concerns in curbing maintenance and preventing blight here. But the city never gave those restrictions a chance. At the time it passed its maintenance restrictions, it banned the speech in 25 zones, and then pushed them back 40 feet from the road, unless hidden behind landscaping. You talked about the city's evidence. Did the charities put on evidence that would support that the maintenance problem was not        I mean, there's a lot of evidence. I mean, there's a lot of evidence. I'm sorry. Did the charities put on any evidence to indicate whatever problems the city was alleging about maintaining these bins was exaggerated, and in fact, your own survey or in some other way, you show that most of the bins were properly maintained or whatever your evidence may have been. Was there evidence like that? And if so, what was it? The city, I'm sorry, the charities didn't put on any evidence as to the cleanliness of the bins other than breaking down the city's study as showing only 13 incidents over a five-month period. I can point to some other facts that are in the record. Let me ask you before you leave that piece. Were those reports, you said a survey of the city over a five-month period, perhaps you said. What was the nature of that survey? Were they going to all these bins over a five-month period and seeing week by week, month by month what they looked like? Yes. And I can go back and look at the exact frequency of the visits, but yeah, they basically toured all of the donations. So they represented it as this is what they're like throughout the city over this five-month period. Yes. It's a report in the record. All right. And I'd also like to point the court to the fact, the reality that since the donation box law was passed, only five permits have been granted. So I think that shows the significant barrier of entry based on these provisions. Is that in the record? Yes. Let me pull that for you. That is found at page 1664 and 1665 in the city of Arlington's answers to the charity's interrogatories. The city argues that banning donation bins from most of Arlington is okay because it leaves open alternative channels for charities to solicit through alternative means, such as door-to-door. But Arlington misses that charitable solicitations are categorically protected under the First Amendment and afforded strict scrutiny. And this law is not narrowly tailored under any standard. The district court correctly found that this law cannot pass even intermediate scrutiny. Underneath all of Arlington's . . . Intermediate scrutiny has to be part of the law, part of the ordinance. That's correct, Your Honor. Just the zoning portion. The one point that the court ruled against the city was, I forget the section number, 3.05C or something, and that has to do with zoning, correct? Where they can be placed. Yes, Your Honor. It's 3.01C, and that's the zoning restriction limiting them to three of 28 zones, yes, Your Honor. That was the only point? That was the only point that the . . . that was the only claim that the district court found for the charities on, yes, Your Honor. Underneath all of Arlington's mischaracterizations about its ban in terms of acreage and percentages, to make it seem smaller than it is, what we have is still a content-based prior restraint on protected charitable solicitations shredding the First Amendment rights of charities across Arlington. Today, I'd briefly discuss . . . I would like to briefly discuss how this law silences protected speech, the applicable level of scrutiny, and briefly, a requested relief. First, the effect of this law is to suffocate protected speech. In addition to require registration and permitting, the city bans the solicitation of donations of clothing and household goods via donation bin in 25 zones. In the three primarily industrial zones in which donation bins are allowed, they have to be pushed back 40 feet from the road, less hidden by landscaping. Combined with the other setback and placement restrictions, this obscures visibility and makes placement nearly impossible. Counselor, do you acknowledge, or give me a reaction at least, if the city had allowed wider spread locations for the bins and forget about the setback requirement, at some stage doesn't this become a time, place, and manner issue? Not as drafted, Your Honor. Not as what? Not as this ordinance is drafted. My premise wasn't well explained. My premise is that there's much wider spread availability. You may not like it, but you still get to put it at the grocery stores and near residential areas and whatever else, maybe half as many locations as you had before. I don't know. I don't want to give you a number that you'll then latch onto. But doesn't the city have the right to limit on a time, place, and manner the locations of bins to some degree? Yes. That would be intermediate scrutiny if that's all that they did. If this ordinance were drafted differently and it didn't distinguish based on the kinds of solicitation message conveyed on the outdoor structures, we believe that because it targets and regulates and restricts the solicitation for donations of clothing and household goods, which we believe is inherently charitable, and I think Reagan touches on that in the proxy swapping analysis, this is content-based and therefore requires . . . Well, isn't it secondary effects of a certain kind of solicitation? Isn't it fit within that category? Again, it could be excessive, which was my question to your colleague, or maybe not quite colleague, but the counsel on the other side. It does seem to me, I don't want to compare it to Supreme Court cases, most deals with secondary effects of certain kinds of theaters, but it allowed limitation of only certain kinds of theaters because only those had these secondary effects. And it seems to me the city is saying maybe too aggressively in its actions, but nonetheless it's saying only these kinds of bins have the secondary effects that we're worried about. What do you say to that? My answer to that, Your Honor, would be Renton and Alameda Books and Ward, none of those cases, and Renton specifically addressed the secondary effects that my friend mentioned today, but those cases don't apply to content-based laws, and that's very clear under Reid and nothing . . . Content? Content-based. Playtime theater was a certain kind of theater with certain kinds of content. I don't know how you could say it doesn't apply to content-based laws. You could look at limitations that certain kinds of content create, so long as you're focused not on the speech, but on the secondary effects. I may be misreading the law. Tell me where I'm wrong. Don't tell me all the places I'm wrong. What are the ones that are really relevant to you? No. I think the charities agree, certainly in principle, that the government can restrict the time, place, and manner of outdoor receptacles. We think they should do so in a content-neutral way that restricts either all receptacles and can apply those restrictions. When you compare them to dumpsters, and I forget what other terms you use, it does seem to me this is a category that has a certain kind of effect. I've seen an awful lot of dumpsters. They have things all around them as well, but when you can't tell the difference between It absolutely can and should. We support the regulation of these structures. Nothing in our brief suggests we don't support the reasonable regulation of maintenance and time, place, and manner restriction. I think the city absolutely should do that. A properly regulated program benefits everybody. I do note, to your point, that other receptacles do not face these bans and burdens. Yes, I know dumpsters and recycling containers are public receptacles. Those other receptacles soliciting trash or recycling, as in Discovery Network, have the same risks of overflow and aesthetic concerns. That was key to the Sixth Circuit analysis in Planet Aid, allowing dumpsters and recycling receptacles in all zones and without setback restrictions. Therefore, the city treats commercial speech more favorably than charitable solicitation through similar . . . Can't the city really ban dumpsters? No, I don't think you can ban dumpsters. Not even in . . . only in non-residential areas or something. It seems to me that there are certain practical effects on what the city can do for related problems. And these other problems, I don't think . . . I don't know how much speech is involved in what people put into dumpsters. It could be some. I don't want to eliminate that possibility, but that doesn't seem to me to be a speech question. I think . . . That dumpsters are not regulated when those with the speech content are. So maybe you ought to help me with that. I don't quite get the comparison. I think you'll have a commercial dumpster that has the advertising of waste management or what have you on it. I think that's technically considered commercial speech in any event, even if it was non-expressive and had no message on it at all. Those non-expressive structures are being treated more fairly, more favorably than these donation bins. And I think, as I said, the charities agree that maintenance restrictions are certainly appropriate. And I understand the challenge in tailoring the law to the stated interest in curbing maintenance problems. And that's a critical issue in this case. But when First Amendment rights are at stake, and this is . . . the city admits a very common . . . in fact, most donation bins placed in Arlington are charitable solicitations. When First Amendment interests are at stake, precision is the touchstone. That's NAACP v. Button. And citing Brown v. City of Grand Junction, which was a panhandling case that went too far, that the court there, I think, appropriately said, this is a situation that requires a scalpel and not a sledgehammer. And the city went with a sledgehammer because that was easier. And the Supreme Court, in a recent decision in Americans for Prosperity Foundation v. Bonta, commented on the weakness of the interest in administrative ease, particularly in the First Amendment context, and that was a charitable solicitation context. The government cannot, because it's easier, ban protected speech. I don't recall in the papers, the donation boxes or bins are six feet by four feet by five feet. But do they have covers? I don't recall whether they have covers. No, they do not have covers. And one of the original provisions in the Ordinance 16-020, and I can tell you where in the record that is if you'd like, had a provision, and we talk about this in our briefs, had a provision that required a two-sided opaque sign, about six feet in height, wooden. And that was one of the objections that the charities made because it completely obstructs the visibility of the bins. You can't see them from the road. You can't see them. Is there a reason in the record, is there a reason why there are no covers, unlike a dumpster, which has a cover? Because you wouldn't be able to see it? No, ma'am, a cover. I'm sorry. A cover on top, so you lift. Oh, a lid. I'm so sorry, Your Honor. Yes, yes, there are lids, and they're required to, I believe, have lids and locking mechanisms, but they do. Okay, so they have lids. Yes. Yes, all of the charities' bins have lids, and I can point you to some pictures of the bins in the record if you'd like to see what they look like. But yes. You each have in your brief a picture of a bin. They seem to be somewhat different pictures. Your Honor, that is correct. Nonetheless, an observation you saw as well. Help me again a little bit. Let's say this is a time, place, and manner restriction. What are the limits on those restrictions? What are the limits on such a restriction relevant to this case? I think it does fit into the setback to the locations. What is your best authority that would say the city went too far? Even on intermediate scrutiny, it fails because the city's limitations . . . One state calls them an undue burden. Other times, well, I don't want to get into the other labels. But what best fits your argument that the city has too restrictively limited, even under intermediate scrutiny, the locations of these bins? Thank you, Your Honor, for that question. The city . . . I just want to start with the burden of proof. The city bears the burden of proving that its law is narrowly tailored to a significant government interest. And even because the city moved for summary judgment, its burden is to show beyond peradventure that this law is not restricting substantially more speech than necessary to achieve its stated interests. And I note the city showed no evidence that its law is narrowly tailored. It simply argued it's narrowly tailored because we said so. The city showed no evidence that a complete ban is necessary in one zone, let alone 25. The city shows no evidence that a 40-foot setback is necessary. Counsel, I think he's asking for a legal precedent, a case, your best case. I would point you first to McClellan. I'd also call you to Blitch v. City of Sladell, Redondo Beach, Watkins, which is another city of Arlington case, and Mansfield, which is a recent case by Judge O'Connor in the district court. In McClellan, for example, the court found that for a problem to arise only once a week in one city, creating a 35-foot buffer zone at every clinic across the commonwealth was hardly a narrowly tailored solution. And I think we have that issue here, and we discussed that in our briefs at the district court and in this court. The charities provided affidavit and deposition testimony evidence that the 40-foot setback is really problematic. I think that my friend here today mentioned some of the deposition testimony, but I don't think that was an accurate characterization of the statements made by those witnesses. They explained we can't physically get a bin placed because of this restriction. And the reality is most of these lots are smaller, medium-sized lots. Even some of your shopping center lots are broken up by smaller lots. So when you're looking at 40 feet from the road, you're often in the building, on the sidewalk, at the building entrance, in an access easement, in a landscaping easement, in a drive aisle. And there's so many other prohibitions that that 40 feet is just too far. And I think that's certainly demonstrated along with the zoning ban barrier here in terms of seeing only five donation bin applications granted since 2016. Okay. I hate to tell you, but your time is up. Thank you, Your Honors. Thank you. Your Honors, I would like to address a few points that my colleague raised. As I heard the argument, the charities acknowledge that the city can regulate the time and manner of donation boxes, but not the place. This is a time, place, and manner regulation that regulates all three aspects of that type of regulation. I would rephrase what the opposing counsel said as saying, you can regulate all three, but you can't over-regulate all three. There are too few places. Certainly. You cannot regulate, over-regulate. What is over-regulation? Over-regulation is if you pass an ordinance that doesn't just pick up the particular ill that the city seeks to address, but goes beyond that. It goes beyond that to capture things like the sale of Girl Scout cookies or a lemonade stand, just like in the Redondo Beach case. This does nothing of the sort. I want to be very clear on this. There is nothing in this ordinance that regulates content, particularly charitable solicitation. The ordinance requires two things, that the donation box operator be identified and text stating that all items must fit in the box. It does not in any way restrict a for-profit or charitable message at all. Any message, any content that the charities or for-profit operators of boxes, and again, there are for-profit operators of boxes, mostly that take recycled items and then resell those. Nothing restricts the message. That is totally different than Abbott, Judge Barksdale, where these Texas Business and Commerce Code provision specifically compelled disclosures of fee arrangements between charities and for-profit. That's so clearly content-based. It's no wonder that case came out the way it did. Reagan was a little more challenging because the content of the sign ordinance, the Austin sign ordinance, had to be reviewed. I know this court struggled to apply Reed and decide that case. Ultimately, the Supreme Court said even that wasn't content-based. They made it clear now, though. I'm sorry, Your Honor? The Supreme Court made it clear now in their Reagan decision. I'm just offering that as a possible . . . Absolutely. That's exactly my point. That was a challenging case. I understand why the court struggled with applying that ordinance. Ultimately, the Supreme Court added clarity and said, that's not even content-based. This case is at the far opposite end of the spectrum from Abbott. Just as Abbott was very clearly content-based, this case is very clearly content-neutral. It is beyond argument that we do not, the city does not, regulate the charitable or other message provided by the donation box operators. Whether it's a for-profit, non-profit, whatever. We just need the name of the operator so we can enforce the ordinance. It is not a content-based ordinance. It's certainly not subject to strict scrutiny. Consider that the charities have urged that Abbott stands for the proposition that any regulation of a donation box is subject to strict scrutiny. That's what the brief says. That would elevate donation boxes above religious speech and political speech and other forms of speech. That's not what Abbott holds, and that doesn't control. What is in the record as to why, assuming counsel is correct that only five permits have been granted, what is in the record, the evidence by the city, as to why only five have been granted? I don't know offhand, Your Honor, in terms of the record sites, but what I can inform this court is that it's certainly not the result of permits being denied. I'm unaware of any challenge to a permit that meets the requirements of the ordinance being denied. I simply just don't know off the top of my head what the record evidence is as to those five and whether it's a total of five. The record now is somewhat cold in this case because, of course, the case has been on appeal. But to turn it, to respond to counsel's comments about the evidence of that, there is no evidence in this record to support that the 40-foot setback makes these boxes not visible. There's not one picture in the record that indicates that these statements that the setback's too much, that it prevents us from placement, that out of 7,100 acres, there aren't any places we can put boxes. This is a case about speech. Both of you keep going beyond the red light. That's quite all right. Fair enough, Your Honor, and I'm not intending to do that, but there's simply no evidence of that. It's not accurate. All right, counsel, thank you. Thank you, Your Honor. We'll take a brief recess before hearing the final case.